**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| |
|---|
| ASTRAZENECA PHARMACEUTICALS LP<br>1800 Concord Pike<br>Wilmington, Delaware  19850<br><br>      *Plaintiff*,<br> *v.*<br><br>ANTHONY BROWN, in his official capacity<br>as the Attorney General of Maryland<br>200 Saint Paul Place<br>Baltimore, Maryland  21202<br><br>and<br><br>MARYLAND BOARD OF PHARMACY<br>4201 Patterson Avenue<br>Baltimore, Maryland  21215<br><br>      *Defendants*. |

Civil Action No.  1:24-cv-1868

## <u>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>

### INTRODUCTION

1. Section 340B of the federal Public Health Service Act, 42 U.S.C. § 256b, requires manufacturers to offer their products to a specific list of covered entities at steeply discounted rates. Because such price controls can disincentivize innovation and destabilize markets, Congress carefully crafted Section 340B and limited participation in the program to fifteen—and only fifteen—types of covered entities. Off-site, for-profit pharmacy chains (like CVS or Walgreens) were *not* included on the list of covered entities.

2. In fact, federal courts have already rebuffed efforts to force manufacturers to provide 340B-discounted drugs for sales occurring through these so-called "contract pharmacies." The U.S. Court of Appeals for the Third Circuit held that AstraZeneca's "restrictions on delivery

[of 340B-discounted drugs] to contract pharmacies do not violate Section 340B," and it "enjoin[ed] [federal officials] from enforcing against" AstraZeneca any "reading of Section 340B as requiring delivery of discounted drugs to an unlimited number of contract pharmacies." *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 706 (3d Cir. 2023). The Third Circuit's decision was then incorporated, by the federal district court in Delaware. into a permanent federal injunction protecting AstraZeneca's right to proceed with its lawful contract pharmacy policy.

3.      The D.C. Circuit recently joined the Third Circuit, similarly "reject[ing] [the] position that section 340B prohibits drug manufacturers from imposing any conditions on the distribution of discounted drugs to covered entities." *Novartis Pharma. Corp. v. Johnson*, 102 F.4th 452, 459 (D.C. Cir. 2024).

4.      Apparently dissatisfied with the scope of federal law, the State of Maryland has enacted a statute seeking to achieve under state law precisely the same result that federal courts have resoundingly rejected. Known as HB 1056, the Maryland statute requires pharmaceutical manufacturers to offer 340B-discounted pricing for sales at an unlimited number of contract pharmacies.

5.      The Maryland statute requires manufacturers to make 340B-discounted drugs available to any and all pharmacies that are "under contract with or otherwise authorized by a covered entity to receive 340B drugs on behalf of the covered entity." These pharmacies are not agents of the covered entities, and the covered entities do not retain title to the products held by these pharmacies. Instead, HB 1056 purports to allow contract pharmacies to demand steep discounts on products acquired *by* the contract pharmacies. HB 1056 thus extends Section 340B's price caps beyond the scope of the federal program to reach contract pharmacy sales—in effect, vastly expanding discounts under the federal 340B program to an entirely new category of

transactions. This expansion of the 340B program results in a direct conflict between federal law and state law.

6.    Plaintiff AstraZeneca Pharmaceuticals LP brings this action to enjoin enforcement of HB 1056. AstraZeneca argues that HB 1056 cannot validly be enforced against AstraZeneca for four separate and independent reasons.

7.    *First*, HB 1056 creates a direct conflict with—and thus is preempted by—federal law under the Supremacy Clause of the U.S. Constitution and the Maryland Constitution. *See* U.S. Const. art. VI, cl. 2; Md. Const. Decl. of Rights, art. II. HB 1056 directly conflicts with rulings of the Third and D.C. Circuits, which make clear that the federal 340B statute does *not* obligate manufacturers to deliver discounted drugs to unlimited contract pharmacies. HB 1056 also conflicts with the Delaware district court's injunction, which forbids federal officials from trying to impose that obligation on AstraZeneca. State officials may not impose it either. And no State may engraft new, costly obligations under state law onto an existing federal benefits program—especially not one, like the 340B program, that involves nationally uniform standards and exclusive enforcement by federal agencies.

8.    *Second*, HB 1056 creates a direct conflict with—and thus is preempted by—federal patent law. In *Biotechnology Indus. Org. v. District of Columbia*, the Federal Circuit squarely held that federal patent law "prohibits states from regulating the price of patented goods." 496 F.3d 1362, 1372 (Fed. Cir. 2007). Yet HB 1056 does precisely that. It requires manufacturers like AstraZeneca to provide contract pharmacies with access to their patented drugs at steeply discounted prices, thereby extending federal price caps to an additional category of patented drug sales (contract pharmacy sales) that federal courts have held fall *outside* of the 340B program.

9.     *Third*, HB 1056 violates the Contracts Clause of the U.S. Constitution. *See* U.S. Const. art. I, § 10, cl. 1. The 340B program is enforced through agreements between drug manufacturers and the Secretary of the U.S. Department of Health and Human Services (HHS). 42 U.S.C. § 256b(a)(1). HB 1056 substantially interferes with the operation of those agreements and with manufacturers' rights and obligations thereunder.

10.    *Fourth*, HB 1056 violates the Takings Clauses of the U.S. Constitution and the Maryland Constitution. *See* U.S. Const. amend. V; Md. Const. art. III, § 40. Under these Takings Clauses, "the sovereign may not take the property of *A* for the sole purpose of transferring it to another private party *B*," a prohibition that applies regardless of whether "*A* is paid just compensation." *Kelo v. City of New London*, 545 U.S. 469, 477 (2005); *see Mayor & City Council of Baltimore City v. Valsamaki*, 397 Md. 222, 273-74 (2007). But HB 1056 requires manufacturers like AstraZeneca to transfer their property (prescription drugs) to another private party (contract pharmacies and the covered entities with which they contract). This forced transfer would be unlawful even if manufacturers were paid just compensation for these contract pharmacy sales. But in fact they are not: Manufacturers are compensated at steeply discounted prices, well below fair market value.

11.    AstraZeneca therefore seeks an order: (1) declaring that HB 1056 is preempted by Section 340B; (2) declaring that SB 324 is preempted by federal patent law; (3) declaring that HB 1056 is unconstitutional as applied to AstraZeneca under the Contracts Clause; (4) declaring that HB 1056 is unconstitutional as applied to AstraZeneca under the federal and Maryland Takings Clauses; and (5) enjoining Defendants—Maryland Attorney General Anthony Brown and the Maryland Board of Pharmacy—from enforcing HB 1056 against AstraZeneca through

investigative demands, administrative proceedings, lawsuits seeking civil penalties or other relief, or in any other manner.

## JURISDICTION AND VENUE

12.   This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (action arising under the Constitution of the United States) and 28 U.S.C. § 1338(a) (civil action arising under any Act of Congress relating to patents). An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201-02.

13.   This Court also has inherent equitable powers to enjoin actions of state officials that contradict the federal Constitution or federal law. *See Ex parte Young*, 209 U.S. 123, 159-60 (1908); *accord, e.g.*, *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689-90 (1949).

14.   Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because this action challenges a Maryland law that applies to and purports to regulate the sale of AstraZeneca's products in this District. AstraZeneca makes its drugs available and sells its products to multiple 340B-covered entities within this District and these entities maintain multiple contract pharmacy arrangements. The challenged law (if not invalidated) would apply to conduct and property in this District, including AstraZeneca's, and is highly likely to be enforced in this District.

15.   Venue is also proper in this Court under 28 U.S.C. § 1391(b)(1) because Defendants maintain offices in this District, through which Defendants would enforce the law challenged in this action.

## PARTIES TO THE ACTION

16.   Plaintiff AstraZeneca Pharmaceuticals LP is a limited partnership organized under the laws of the State of Delaware with its principal place of business in Wilmington, Delaware. AstraZeneca is a biopharmaceutical company focusing on the discovery, development,

manufacturing, and commercialization of medicines. AstraZeneca participates in the 340B program.

17.     Defendant Anthony Brown is the Attorney General of Maryland. In that role, he enforces the challenged legislation. This suit is brought against him in his official capacity only.

18.     Defendant Maryland Board of Pharmacy ("Board of Pharmacy") is the state agency authorized to issue and condition licensure and permitting of wholesale drug distributors, third-party logistics providers, and manufacturers.

## FACTUAL ALLEGATIONS

### *The Federal 340B Program Caps Drug Prices for Enumerated Covered Entities that Provide Healthcare to Certain Underserved Populations*

19.     Section 340B of the Public Health Service Act established a federal program that "imposes ceilings on prices drug manufacturers may charge for medications sold to specified health-care facilities," known as covered entities, that provide healthcare to certain underserved populations. *Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 113 (2011).

20.     As a condition of receiving coverage and reimbursement for its drugs under Medicaid and Medicare Part B, a pharmaceutical manufacturer must enter into a pharmaceutical pricing agreement with HHS. 42 U.S.C. § 256b(a)(1). In that agreement, the manufacturer must "offer each covered entity covered outpatient drugs for purchase" at a specified discount price "if such drug is made available to any other purchaser at any price." *Id.* This is known as Section 340B's "must-offer" requirement. Manufacturers that "knowingly and intentionally charge[] a covered entity a price for purchase of a drug that exceeds the [340B discount price]" are subject to civil monetary penalties. *Id.* § 256b(d)(1)(B)(vi)(III). The 340B statute also regulates covered entities, which may not obtain 340B pricing on units of drugs for which a manufacturer pays a

6

Medicaid rebate (known as "duplicate discounts"), nor resell or otherwise transfer such drugs to persons other than their patients (known as "diversion"). *Id.* § 256b(a)(5)(A), (B).

21.     Congress enacted Section 340B to give covered entities access to prescription drugs at below-market prices, thereby helping them serve their uninsured and indigent patients. H.R. Rep. No. 102-384, pt. 2, at 7 (1992). Balanced against its goal of increasing access, however, Congress also recognized the need to "assure the integrity of the drug price limitation program." *Id.* at 16.

22.     Congress has added to the list of 340B-covered entities over time, and today there are fifteen delineated categories of covered entities. 42 U.S.C. § 256b(a)(4)(A)-(O).

23.     Notably, Congress has *never* included contract pharmacies in the statutorily-defined list of facilities that qualify as covered entities. Indeed, in drafting what would become the 340B statute, Congress considered proposed language that would have permitted covered entities to dispense 340B drugs through *on-site* contractors providing pharmacy services. *See* S. Rep. No. 102-259, at 1-2 (1992) (requiring manufacturers to provide a discounted price for drugs that are "purchased and dispensed by, or under a contract entered into for *on-site pharmacy services* with" certain enumerated covered entities) (emphasis added). But that provision was not enacted.

24.     The 340B program has its own federal enforcement provisions and administrative dispute-resolution process. Congress required the Secretary of HHS to establish an adjudicatory body to resolve disputes among participants in the 340B program, including "claims by covered entities that they have been overcharged for drugs purchased under this section [340B], and claims by manufacturers … of violations" by covered entities. 42 U.S.C. § 256b(d)(3)(A). Under that statutory mandate, the Health Resources and Services Administration (HRSA), the subagency of HHS that oversees the 340B program, has established "requirements and procedures for the 340B

Program's administrative dispute resolution (ADR) process." 85 Fed. Reg. 80,632 (Dec. 14, 2020). The ADR Rule authorizes panels of federal officers to resolve claims for "monetary damages," as well as other unspecified "equitable relief" sought by claimants. 42 C.F.R. § 10.21(a). And it empowers ADR panels to address a range of factual and legal disputes, including "those having to do with covered entity eligibility, patient eligibility, or manufacturer restrictions on 340B sales." 85 Fed. Reg. at 80,636.

25.     HRSA recently revised the ADR Rule. *See* 89 Fed. Reg. 28,643 (Apr. 19, 2024). Among other things, the revised rule gives "340B ADR Panel[s]" responsibility to resolve disputes related to "overcharge[s]," which include claims that a manufacturer has "limited [a] covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling prices." 42 C.F.R. §§ 10.3, 10.21.

### *Contract Pharmacy Use Leads to Abuse and Profiteering*

26.     Section 340B does not require manufacturers to deliver 340B-discounted drugs to contract pharmacies—or indeed, to *any* entity not specifically enumerated in the statute. In the decades since the enactment of the program, however, HRSA has issued two non-binding "guidance" documents purporting to authorize covered entities to enter into agreements with contract pharmacies to dispense outpatient drugs under Section 340B.

27.     In 1996, HRSA issued guidance providing that "eligible covered entities that do not have access to appropriate 'in-house' pharmacy services" could now enter into an agreement with a *single* outside pharmacy of its choice to provide such services for 340B drugs. 61 Fed. Reg. 43,549, 43,555 (Aug. 23, 1996) (1996 Guidance) (emphasis added).

28.     Then, in 2010, HRSA released new guidance stating that covered entities must now be permitted to "use multiple pharmacy arrangements"—that is, an *unlimited* number of contract pharmacies, without any geographic limits—"as long as they comply with guidance developed to

help ensure against diversion and duplicate discounts and the policies set forth regarding patient definition." 75 Fed. Reg. 10,272, 10,273 (2010 Guidance). The 2010 Guidance thus purported to authorize a covered entity to enter into an unlimited number of contract pharmacy arrangements anywhere in the United States.

29.     The 2010 Guidance triggered a massive surge in the number of contract pharmacies receiving and distributing 340B drugs. *See Novartis Pharma.*, 102 F.4th at 457 ("significant expansion"). In 2018, the Government Accountability Office reported that the number of contract pharmacies had ballooned from 1,300 in 2010, to nearly 20,000 in 2017. U.S. Gov't Accountability Off., GAO-18-480, *Drug Discount Program: Federal Oversight of Compliance at 340B Contract Pharmacies Needs Improvement* 2 (June 2018) (2018 GAO Report), https://www.gao.gov/assets/700/692697.pdf. These numbers have continued to escalate. Today, more than 33,000 different pharmacies participate in the 340B program, with more than 194,000 individual contracts. Adam J. Fein, Drug Channels Inst., *Exclusive: For 2023, Five For-Profit Retailers and PBMs Dominate an Evolving 340B Contract Pharmacy Market* (Jul. 11, 2023), https://www.drugchannels.net/2023/07/exclusive-for-2023-five-for-profit.html. The vast majority of these contract pharmacies (75% as of 2018) are for-profit retail chain pharmacies; and the five largest national pharmacy chains—CVS, Walgreens, Walmart, Rite-Aid, and Kroger—accounted for a combined 60% of all 340B contract pharmacies, even though these chains represent only 35% of all pharmacies nationwide. 2018 GAO Report at 20-21.

30.     Make no mistake, the boom in contract pharmacies has been fueled by the prospect of outsized profit margins on 340B-discounted drugs. As the D.C. Circuit has explained:

> While some contract pharmacies maintain separate inventories of section 340B drugs, most fill prescriptions from inventories that intermingle discounted and non-discounted drugs. Only after dispensing the drugs do these pharmacies attempt to discern whether individual customers were patients of covered entities—in other words, whether individual

prescriptions were eligible for the discount. Many pharmacies outsource this determination to third-party administrators, who often receive a larger fee for every prescription deemed eligible for the discount. Once the pharmacy or the administrator categorizes a certain number of prescriptions as eligible, the pharmacy places an order to replenish its section 340B purchases. The covered entity, the pharmacy, and the third-party administrator often divvy up the spread between the discounted price and the higher insurance reimbursement rate. Each of these actors thus has a financial incentive to catalog as many prescriptions as possible as eligible for the discount.

*Novartis Pharma.*, 102 F.4th at 457-58; *see* Decl. of Krista M. Pedley ¶¶ 5-9, *Sanofi-Aventis U.S., LLC v. HHS*, No. 3:21-cv-634 (D.N.J. June 24, 2021), ECF No. 93-2. Since a 340B discount is applied for the contract pharmacy sale—even though the sale has *also* benefitted from the full insurance reimbursement—this dynamic results in substantial arbitrage revenues. *See Sanofi*, 58 F.4th at 699 ("[T]hey turn a profit when insurance companies reimburse them at full price for drugs that they bought at the 340B discount."). And though the pharmacy may share some of its windfall with the covered entity (or the covered entity's vendor), *the patient* has still paid the full out-of-pocket amount designated under his or her insurance policy.

31.     As Senator Chuck Grassley put it in a letter to HRSA, for-profit pharmacies "are reaping sizeable 340B discounts on drugs and then turning around and upselling them to fully insured patients covered by Medicare, Medicaid, or private health insurance in order to maximize their spread." Letter from Sen. Chuck Grassley, S. Comm. on the Judiciary, to Mary K. Wakefield, Adm'r, HRSA (Mar. 27, 2013), https://www.grassley.senate.gov/download/2013-03-27-ceg-to-hrsa-340b-oversight-3. This "spread" means contract pharmacies retain up to $5 billion in annual profits from 340B sales. *See* Neal Masia, *340B Drug Pricing Program: Analysis Reveals $40 Billion in Profits in 2019*, Alliance for Integrity & Reform 2 (May 2021), http://bit.ly/4bM7sHE; Laura Joszt, *340B, Biosimilars, and More in the Future of Specialty Pharmacy*, Am. J. of Managed Care (May 4, 2022), https://bit.ly/4c61Do6 (five contract pharmacies "earn about $3.2 billion in gross profits from 340B"); Walgreens Boots Alliance, Inc., Form 10-K (Oct. 15, 2020),

10

https://bit.ly/3KveDrI (noting that "[c]hanges in pharmaceutical manufacturers' . . . distribution policies . . . in connection with the federal 340B drug pricing program[] could . . . significantly reduce [Walgreens's] profitability"); Rebecca Pifer, *Hospitals, PBMs Say Drugmaker Restrictions on 340B Discounts Stifling Finances*, HealthcareDive (May 5, 2020), https://bit.ly/3P9xmdF (reporting that CVS Health "said its 340B product lines were stagnant" after contract-pharmacy restrictions were imposed).

32.     Although some of the money generated through contract pharmacy sales is passed on to covered entities, most of these profits are *not* going to federally qualified health centers or other federal grantees that provide services to underserved populations (such as black lung clinics, hemophilia treatment centers, urban Indian health organizations, and AIDS drug purchasing assistance programs). Instead, they are being captured by 340B hospitals and contract pharmacies, which are responsible for nearly 90% of all 340B purchases. Aaron Vandervelde et al., Berkeley Rsch. Grp., *For-Profit Pharmacy Participation in the 340B Program* 7 (Oct. 2020), https://bit.ly/3owtUwa.

33.     Nor are these huge profits being passed on to patients. For example, in response to a 2018 GAO survey, 45% of covered entities admitted they do not pass along *any* discount to *any* patients that use *any* of their contract pharmacies. 2018 GAO Report at 30. As for the remaining 55%, the GAO noted that entities using contract pharmacies may provide discounts to patients only in limited cases. *Id.* Likewise, the HHS Office of Inspector General found in 2014 that some contract pharmacies do not offer 340B-discounted prices to uninsured patients at all. HHS-OIG, *Memorandum Report: Contract Pharmacy Arrangements in the 340B Program*, OEI-05-13-00431, at 2 (Feb. 4, 2014) (2014 OIG Report), https://oig.hhs.gov/oei/reports/oei-05-13-00431.pdf. As a result, "uninsured patients pay the full non-340B price for their prescription drugs

at contract pharmacies." *Id.* By contrast, the GAO noted that 17 of 23 of the surveyed covered entities that had *in-house* pharmacies reported offering discounts at those pharmacies. 2018 GAO Report at 30 n.46.

34.     In short, the widespread proliferation of contract pharmacy arrangements since 2010 has transformed the 340B program from one intended to assist vulnerable patients into a multi-billion-dollar arbitrage scheme that benefits national for-profit pharmacy chains and other for-profit intermediaries.

35.     At the same time, the explosive growth of contract pharmacy arrangements also has facilitated increased diversion and duplicate discounts. *See Novartis Pharma.*, 102 F.4th at 458. A 2011 report from the Government Accountability Office warned that "[o]perating the 340B program in contract pharmacies creates more opportunities for drug diversion compared to in-house pharmacies." U.S. Gov't Accountability Off., GAO-11-836, *Drug Pricing: Manufacturer Discounts in the 340B Program Offer Benefits, but Federal Oversight Needs Improvement* 28, (Sept. 23, 2011), https://www.gao.gov/assets/330/323702.pdf. The report further found that "HRSA's oversight of the 340B program is inadequate because it primarily relies on participants' self-policing to ensure compliance." *Id.* at 21.

36.     These structural problems have only intensified over time, as the use of multiple contract pharmacies has become rampant. The 2014 OIG report determined that self-policing by covered entities has been insufficient to stop these abuses, since "most covered entities . . . do not conduct all of the oversight activities recommended by HRSA." 2014 OIG Report at 2. The 2018 GAO Report similarly criticized the continuing "weaknesses in HRSA's oversight [that] impede its ability to ensure compliance with 340B Program requirements at contract pharmacies." 2018 GAO Report at 45.

37.     Indeed, HRSA's own audits of covered entities continue to identify numerous instances of abuse. The 2018 GAO Report observed that "66 percent of the 380 diversion findings in HRSA audits [between 2012 and 2017] involved drugs distributed at contract pharmacies." *Id.* at 44. And based on information from HRSA's website, over 25% of covered entities audited since 2017 have had at least one finding related to contract pharmacy noncompliance. Indeed, out of 199 audits conducted in 2019, HRSA discovered dozens of instances of duplicate discounts, as well as evidence that at least 19 covered entities had permitted diversion of 340B drugs through contract pharmacies. *See* HRSA, *Program Integrity: FY19 Audit Results*, https://www.hrsa.gov/opa/program-integrity/audit-results/fy-19-results.

### AstraZeneca's 340B Policy and Resulting Litigation

38.     Against this legal and factual backdrop, in August 2020 AstraZeneca announced to covered entities that, effective October 1, 2020, it would revert to the contract pharmacy approach set forth in HRSA's 1996 Guidance.

39.     Under this policy, AstraZeneca continues to make its products available at 340B-discounted prices—in unlimited quantities—to all covered entities. For covered entities that do not maintain their own on-site dispensing pharmacy, AstraZeneca delivers discounted drugs to a single contract pharmacy site for each covered entity. But AstraZeneca no longer delivers 340B drugs to an unlimited number of contract pharmacies.

40.     AstraZeneca's policy is consistent with the letter and intent of the 340B program—limiting the potential for abuse, while still enabling all covered entities and their patients to continue to access AstraZeneca's medicines at 340B prices. Under AstraZeneca's policy, several thousand covered entities that lack an on-site pharmacy have registered a contract pharmacy to which AstraZeneca continues to deliver 340B-discounted drugs, including at least 42 covered

13

entities in Maryland. AstraZeneca is committed to working with all covered entities to ensure that every patient can obtain needed medicines at prices they can afford.

41.     In response to AstraZeneca's new contract pharmacy policy and other manufacturers' adoption of similar policies, HHS and HRSA issued an Advisory Opinion on December 30, 2020, asserting that the 340B statute requires manufacturers to deliver 340B-discounted drugs for unlimited contract pharmacy sales.

42.     In early 2021, AstraZeneca filed suit in the U.S. District Court for the District of Delaware against HHS and HRSA, challenging the Advisory Opinion. On June 16, 2021, the Delaware court issued a detailed opinion finding the Advisory Opinion unlawful. *AstraZeneca Pharms. LP v. Becerra*, 543 F. Supp. 3d 47 (D. Del. 2021). The court concluded that Section 340B "says nothing about the permissible role (if any) of contract pharmacies," and that, in light of this "total omission," the Advisory Opinion's attempt to impose an obligation on AstraZeneca to deliver discounted drugs to unlimited contract pharmacies was "legally flawed." *Id.* at 59. The agency withdrew the Advisory Opinion following the Delaware court's ruling.

43.     In a second ruling, the Delaware court addressed AstraZeneca's challenge to a "violation letter" issued by HRSA, which adopted the same position as the Advisory Opinion. The court again rejected the agency's view that Section 340B obligates drug manufacturers to deliver 340B-discounted drugs for unlimited contract pharmacy sales. *AstraZeneca Pharms. LP v. Becerra*, No. 21-cv-27, 2022 WL 484587 (D. Del. Feb. 16, 2022). The court reiterated "key points" from its prior opinion, including that Congress "did not clearly intend for drug manufacturers to be required to facilitate sales of covered drugs for dispensing by an unlimited number of contract pharmacies." *Id.* at *5-*6.

44.    On January 30, 2023, the U.S. Court of Appeals for the Third Circuit affirmed the Delaware court's rulings. In a consolidated opinion addressing AstraZeneca's case and appeals in parallel actions by other manufacturers, the Third Circuit held that the Advisory Opinion and violation letter are "unlawful," and it "enjoin[ed] HHS from enforcing against" AstraZeneca HHS's "reading of Section 340B as requiring delivery of discounted drugs to an unlimited number of contract pharmacies." *Sanofi*, 58 F.4th at 706. The court of appeals also held that AstraZeneca's "restrictions on delivery to contract pharmacies do not violate Section 340B." *Id.*

45.    The government neither sought en banc review of the Third Circuit's decision nor filed a petition for certiorari in the U.S. Supreme Court.

46.    On May 5, 2023, the Delaware court issued a final judgment in AstraZeneca's case, to which the government stipulated. The court's order provides that it is:

a.    "DECLARED that Advisory Opinion 20-06 and the Violation Letter from the Health Resources and Services Administration to Plaintiff AstraZeneca Pharmaceuticals LP (AstraZeneca), dated May 17, 2021 (Violation Letter), are unlawful;

b.    DECLARED that AstraZeneca's policy limiting the use of contract pharmacies under Section 340B of the Public Health Service Act (Section 340B), 42 U.S.C. § 256b—namely, that covered entities may use an in-house pharmacy and, if they do not have an in-house pharmacy, they may use one contract pharmacy—does not violate Section 340B;

c.    ORDERED that the Violation Letter is VACATED as contrary to law pursuant to 5 U.S.C. § 706;

d.    ORDERED that Defendants, including their officers, agents, and employees, are ENJOINED from enforcing against AstraZeneca the agency's reading of

15

Section 340B as requiring delivery of discounted drugs to an unlimited number of contract pharmacies."

Final Judgment at 1, *AstraZeneca*, No. 1:21-cv-27 (D. Del. May 5, 2023), ECF No. 123.

47.     As a result of the Third Circuit's ruling and the Delaware court's injunction, AstraZeneca is entitled to proceed with its lawful contract pharmacy policy.

### *Maryland Enacts Legislation Requiring Manufacturers to Make 340B-Discounted Drugs Available for Unlimited Contract Pharmacy Sales*

48.     On May 16, 2024, the State of Maryland enacted HB 1056, codified at Md. Code, Health Occup. § 12-6C-09.1, *et seq.*, an act concerning "State Board of Pharmacy – Prohibition on Discrimination Against 340B Drug Distribution."

49.     HB 1056 expressly identifies the federal 340B program as its regulatory object. It has the express "purpose of prohibiting a 340B manufacturer from taking certain direct or indirect actions to limit or restrict the acquisition or delivery of a 340B drug." *See* HB 1056.

50.     HB 1056 does not specify any source for the State's purported authority to add requirements to a comprehensive federal healthcare program.

51.     HB 1056 provides that "a 340B manufacturer may not directly or indirectly deny, restrict, prohibit, discriminate against, or otherwise limit the acquisition of a 340B drug by, or delivery of a 340B drug to, a pharmacy that is under contract with or otherwise authorized by a covered entity to receive 340B drugs on behalf of the covered entity." Md. Code, Health Occup. § 12-6C-09.1(C)(1). This provision does not identify a geographical limit to its coverage.

52.     HB 1056 does not prohibit diversion or otherwise require that drugs purchased at 340B-discounted prices be dispensed only to patients of a covered entity. *See* 42 U.S.C. § 256b(a)(5)(B). Nor does HB 1056 account for HRSA's enforcement authority or for the congressionally mandated procedures for administrative dispute resolution. *See id.* § 256b(d)(3).

53.     HB 1056 instead states that a violation of the act "is an unfair, abusive, or deceptive trade practice within the meaning of Title 13 of the Commercial Law Article and is subject to the enforcement and penalty provisions contained in Title 13 of the Commercial Law Article."  Md. Code, Health Occup. § 12-6C-09.1(D)(1). Title 13 of the Commercial Law ostensibly allows for criminal penalties.  *See* Md. Code, Com. Law § 13-411.  HB 1056 also says that a civil fine in the amount of $5,000 per violation may be assessed, and violation may lead to discipline, suspension, or revocation of a license for any person licensed by the Board of Pharmacy. Md. Code, Health Occup. §§ 12-6C-09.1(D)(2), (3).

54.     The operation and apparent intent of HB 1056 is to compel pharmaceutical manufacturers to make 340B-discounted drugs available to an unlimited number of contract pharmacies, notwithstanding the Third and D.C. Circuits' holdings that federal law imposes no such requirement, and notwithstanding the Delaware court's injunction.

55.     HB 1056 does not regulate drug distribution; instead, it regulates access to 340B *discounts*. Because the law defines "340B drug" as "a covered outpatient drug under" Section 340B that "has been subject to an offer for reduced prices by a 340B manufacturer under" 340B, Md. Code, Health Occup. §1 2-6C-09.1(A)(4), HB 1056 on its face regulates pricing—and insofar as manufacturers are affected, *only* regulates pricing. In requiring manufacturers to provide access to "340B drugs," the statue confers access to *prices* that have been reduced under the statutory formula prescribed by Section 340B. The statute says nothing about any other aspect of the acquisition or delivery of drugs—such as packaging requirements, shipping conditions, shipping costs, or other logistics and specifications of drug delivery and acquisition. Pricing is thus the *only* thing that distinguishes a sale that complies with HB 1056 from a sale that violates the law.

56.     HB 1056 specified that it would take effect on July 1, 2024, by operation of law.

## LEGAL ALLEGATIONS

### *HB 1056 Is Preempted by Section 340B*

57.     The Supremacy Clause of the U.S. Constitution provides that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof," are "the supreme Law of the Land . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2; *see* Md. Const. Decl. of Rights, art. II. The Supremacy Clause "makes federal law the supreme Law of the Land. As a result, federal statutes and regulations … can nullify conflicting state or local actions." *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 761 (4th Cir. 2018) (modification in original) (quoting *Coll. Loan Corp. v. SLM Corp.*, 396 F.3d 588, 595 (4th Cir. 2005)). Under the Supremacy Clause's preemptive effect, "any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." *King v. McMillan*, 594 F.3d 301, 309 (4th Cir. 2010) (quoting *Felder v. Casey*, 487 U.S. 131, 138 (1988)).

58.     HB 1056's mandates for drug manufacturers and the associated enforcement mechanisms are preempted by the 340B statute under the Supremacy Clause in three respects.

59.     ***First***, HB 1056 conflicts directly with Section 340B, 42 U.S.C. § 256b.

60.     Conflict preemption occurs when "impossible for a private party to comply with both state and federal requirements," *Mut. Pharm. Co., Inc. v. Bartlett*, 570 U.S. 472, 480 (2013) (quoting *English v. General Elec. Co.*, 496 U.S. 72, 79 (1990)), and, in such conflicts, "any state law … must yield," *King*, 594 F.3d at 309 (quoting *Felder*, 487 U.S. at 138). Conflict preemption does not require "a specific, formal agency statement identifying conflict in order to conclude that such a conflict in fact exists." *Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 884 (2000).

61.     The obligations imposed by HB 1056 on manufacturers like AstraZeneca directly conflict with the decision of the U.S. Court of Appeals for the Third Circuit that AstraZeneca's

"restrictions on delivery to contract pharmacies do not violate Section 340B," *Sanofi*, 58 F.4th at 706, and with a similar conclusion reached by the D.C. Circuit, *see Novartis Pharma.*, 102 F.4th at 461 (rejecting HHS's reading of Section 340B as "requir[ing] drug makers to deliver [340B-discounted] drugs to an unlimited number of contract pharmacies") (quoting *Sanofi*, 58 F.4th at 703).

62.     HB 1056 also conflicts with the permanent injunction entered by the U.S. District Court for the District of Delaware. The court enjoined HHS, HRSA, and their officers from "enforcing against AstraZeneca the agency's reading of Section 340B as requiring delivery of discounted drugs to an unlimited number of contract pharmacies." Final Judgment at 1, *AstraZeneca*, No. 1:21-cv-27 (D. Del. May 5, 2023), ECF No. 123 (Exhibit 1).

63.     The Third Circuit, D.C. Circuit, and Delaware district court rulings make unmistakably clear that the 340B statute does *not* obligate manufacturers to deliver discounted drugs to unlimited contract pharmacies, and that any attempt by federal officials to impose such an obligation would be unlawful.

64.     HB 1056 adopts the same position that was rejected in the federal litigation and seeks to impose on AstraZeneca the same obligations that were ruled unlawful there: The Maryland law purports to require manufacturers to make 340B-discounted drugs available to an unlimited number of contract pharmacies.

65.     Under the Supremacy Clause, Maryland may not compel private entities to comply with Maryland's preferred interpretation of a federal statute when federal courts have rejected that very interpretation and have enjoined the federal government from applying it to the same entities. *See Mut. Pharm. Co.*, 570 U.S. at 486.

66.     *Second*, HB 1056 "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Columbia Venture, LLC v. Dewberry & Davis, LLC*, 604 F.3d 824, 829-30 (4th Cir. 2010) (quoting *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995)).

67.     By extending 340B pricing to unlimited contract pharmacy sales—thereby drastically increasing manufacturers' costs of participating in the 340B program—HB 1056 impermissibly interferes with important federal policies and objectives. Prior to HB 1056's enactment, covered entities used 340B discounts to "turn a profit" on sales occurring *within* the program. *Sanofi*, 58 F.4th at 699. But HB 1056 imposes costly new obligations on top of that: It requires manufacturers to also make 340B discounts available for an additional category of transactions (contract pharmacy sales) *outside* the 340B program as well. Doing so may enable covered entities and their associated contract pharmacies to "squeeze [more] revenue out of" the program. *Id.* at 704. But it imposes a corresponding cost on manufacturers, significantly increasing the burdens of participating in the federal program. The result is to "exert an extraneous pull on the scheme established by Congress," thus "skew[ing]" the "delicate balance of statutory objectives." *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 348, 353 (2001).

68.     In addition, the Supremacy Clause prohibits States from establishing parallel regimes that encroach on the federal government's authority to set and define federal enforcement priorities. *See id.* at 349.

69.     HB 1056 directly interferes with the robust federal enforcement regime that Congress has enacted for the 340B program, which includes the ADR process, required auditing provisions for manufacturers and covered entities, and the possibility of civil monetary penalties in the event of a manufacturer overcharge or diversion by a covered entity.

70.     By inserting Maryland and its officials into the program that Congress adopted, HB 1056 frustrates the accomplishment of Congress's objectives and interferes with Congress's chosen method of oversight.

71.     *Third*, HB 1056 is preempted because Congress has created and occupied the entire field of 340B regulation.

72.     "[T]he States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona v. United States*, 567 U.S. 387, 399 (2012). Field preemption exists when Congress has adopted a " 'scheme of federal regulation … sufficiently comprehensive to make reasonable the inference that Congress left no room …  for supplementary state regulation;' and … 'where the field is one in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.' " *Specialized Carriers & Rigging Assoc. v. Virginia*, 795 F.2d 1152, 1155 (4th Cir. 1986) (quoting *Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985)).

73.     The 340B program is a comprehensive scheme that protects a dominant federal interest. Congress created it to assist vulnerable populations and has established appropriate boundaries for the program, including by carefully delineating the categories of eligible covered entities. The entirety of the program—including relevant prices, participants, and enforcement mechanisms—is defined by federal law.

74.     In *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110 (2011), the Supreme Court held that private entities may not bring actions under state contract law to enforce the provisions of manufacturers' 340B pharmaceutical pricing agreements. *Id.* at 113-14. "Congress made HHS administrator of … the 340B Program." *Id.* at 120. Suits by private entities, the Court explained,

"would undermine the agency's efforts" to administer the program "harmoniously and on a uniform, nationwide basis." *Id.* "With HHS unable to hold the control rein, the risk of conflicting adjudications would be substantial." *Id.*

75.     Those principles apply equally to preclude state legislation purporting to administer and impose new requirements under the 340B program. Manufacturers' obligations under the program are defined by federal law, as interpreted by federal courts, and are enforced by federal officials.

76.     HB 1056 impermissibly intrudes into this uniquely federal domain. In effect, the law creates a new, sixteenth category of covered entity to which AstraZeneca must deliver unlimited 340B-discounted drugs: contract pharmacies. The statute thus interferes with the careful balance that Congress established in the 340B program, which takes account of both the need to stretch scarce federal resources and the financial and logistical burdens imposed on the manufacturer participants in the program.

### HB 1056 Is Preempted by Federal Patent Law

77.     HB 1056 is not only preempted by Section 340B; it is also preempted by the federal patent laws because it regulates the prices at which patented drugs may be sold.

78.     The Constitution gives Congress authority to establish a system of incentives "[t]o promote the Progress of Science and useful Arts." Art. I, § 8, cl. 8. Under the federal patent law, inventors are "impelled to invest in creative effort" on the promise that they will obtain "a federally protected 'exclusive right'" to sell their inventions for a limited period. *BIO*, 496 F.3d at 1372. The public can benefit from immediate access to new inventions during the exclusivity period; and after the period expires, the public gets "lower price[s] through unfettered competition." *Id.* at 1373. The States are not free to upset that finely calibrated system: "Where it is clear how the

patent laws strike that balance in a particular circumstance, that is not a judgment the States may second-guess." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 152 (1989).

79.     State laws that cap or fix the prices at which patented drugs may be sold are accordingly preempted by federal patent law, as the Federal Circuit has explained, because they "re-balance the statutory framework of rewards and incentives . . . in effect diminishing the reward to patentees in order to provide greater benefit to . . . drug consumers." *BIO*, 496 F.3d at 1374. In *BIO*, the Federal Circuit struck down a District of Columbia law that prohibited patented drugs from "being sold in the District for an excessive price." *Id.* at 1365. The court explained that, notwithstanding "the District's judgment" that drug manufacturers were charging "excessive prices" that "threaten[ed] the health and welfare of the residents of the District as well as the District government's ability to ensure that all residents receive the health care they need," the law was "contrary to the goals established by Congress in the patent laws." *Id.* at 1365, 1374 (quoting D.C. Code § 28-4551). The District's law was therefore preempted because "[t]he underlying determination about the proper balance between innovators' profit and consumer access to medication . . . is exclusively one for Congress to make." *Id.* at 1374.

80.     The same analysis applies to HB 1056. Like the District of Columbia law struck down in *BIO*, HB 1056 restricts the prices at which manufacturers can sell their patented drugs by requiring them to make their drugs available to contract pharmacies at discounted prices. Whereas Section 340B caps drug prices with respect to a limited set of specifically enumerated covered entities, HB 1056 purports to extend those price caps to a category of sales—contract pharmacy sales—that federal courts have held fall *outside* of the federal program. Accordingly, HB 1056 functions as a price cap for contract pharmacy sales that impermissibly constrains manufacturers'

"opportunity" to take advantage of the benefit of exclusivity conferred by Congress "during the patent's term." *Id.* at 1372.

81.     HB 1056 is thus preempted by federal patent law. States are not permitted to set the prices of patented drugs or to "re-balance" the "rewards and incentives" embodied in the federal patent laws, as Maryland has done here. *Id.* at 1374.

### HB 1056 Violates the Contracts Clause

82.     HB 1056 also violates the Contracts Clause of the U.S. Constitution. Article I, section 10, clause 1 of the Constitution provides, "No State shall . . . pass any . . . Law impairing the Obligation of Contracts." Courts have interpreted the Contracts Clause to require a three-part test to balance the State's obligation not to impair contracts with the State's interest in public welfare. *See Catawba Indian Tribe of S. Carolina v. City of Rock Hill*, 501 F.3d 368, 371 (4th Cir. 2007). First, the court asks "whether there has been an impairment of a contract" *Id.* (citing *U.S. Trust Co. v. New Jersey*, 431 U.S. 1, 17 (1977)). Second, if the court finds an impairment, it must examine whether the state law operates as a "substantial impairment of a contractual relationship." *Id.* (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978)). Third, if the State presents a legitimate justification for the impairment, the court "must ask whether that impairment is nonetheless permissible as a legitimate exercise of the state's sovereign power." *Id.* (internal quotation marks omitted) (quoting *Balt. Teachers Union v. Mayor and City Council of Balt.*, 6 F.3d 1012, 1014 (4th Cir. 1993)).

83.     HB 1056 fails at every stage of this test. HB 1056 substantially impairs a contractual relationship. As explained above, the 340B program operates through contracts, which are called pharmaceutical pricing agreements (PPAs). PPAs are "uniform agreements that recite the responsibilities § 340B imposes . . . on drug manufacturers and the Secretary of HHS." *Astra USA*, 563 U.S. at 113. While PPAs are not "transactional, bargained-for contracts," *id.*, they nonetheless

announce the parties' rights and obligations like any other contract, and manufacturers like AstraZeneca are entitled to rely on the PPA's terms when developing their business. Among those terms is the requirement that manufacturers offer discounted drugs only to a specifically delineated set of "covered entities." As the D.C. Circuit recently underscored, neither the 340B statute nor the PPA requires AstraZeneca to "deliver [340B-discounted] drugs to an unlimited number of contract pharmacies." *Novartis Pharma.*, 102 F.4th at  461 (quoting *Sanofi Aventis*, 58 F.4th at 706).

84.     HB 1056 operates as a substantial impairment of AstraZeneca's PPA with the HHS Secretary. AstraZeneca joined the 340B program with the expectation and understanding that it would be required to provide discounted drugs to only a limited number of covered entities, and it accepted that obligation. HB 1056 seeks to unilaterally expand AstraZeneca's obligations under that contract—without AstraZeneca's consent—by requiring AstraZeneca to make discounted drugs available for an entirely new category of sales: contract pharmacy sales.

85.     The Supreme Court has held that similar expansions of beneficiaries to a contract constitute substantial impairment under the Contracts Clause. *See Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 245-46 (1978) (Contracts Clause prohibited Minnesota from requiring company to provide additional pension benefits after it had agreed to provide pension benefits under specific contractual conditions); *see also United Healthcare Ins. Co. v. Davis*, 602 F.3d 618, 630 (5th Cir. 2010) (Contracts Clause prohibited state from enacting legislation increasing obligations on companies that had agreed to insure state employees under specific conditions).

86.     Any justification Maryland might offer for HB 1056 would be insufficient under the Contracts Clause. Maryland cannot claim that its law is necessary to provide access to 340B drugs to covered entities and their patients, because AstraZeneca's policy already ensures that

every covered entity is offered those drugs at a discounted price. Indeed, AstraZeneca's policy goes further, allowing covered entities to designate a single contract pharmacy if it does not have an on-site pharmacy to dispense AstraZeneca's drugs.

87.     Maryland has no legitimate justification for requiring unlimited contract pharmacy arrangements, which will advance the economic interests of for-profit pharmacies at the expense of companies like AstraZeneca, particularly where Congress itself has not required them. *See Garris v. Hanover Ins. Co.*, 630 F.2d 1001, 1009 (4th Cir. 1980) (Contracts Clause violation where "the predominant purpose of the challenged provision was to protect the private interests of [private parties] rather than any broader societal interest").

88.     Nor can Maryland justify HB 1056 as a cost-reduction mechanism for patients. Studies show that most 340B discounts to contract pharmacies are *not* passed on to patients, who must pay full price for their drugs. *See* ¶ 33, *supra*.

89.     Finally, even if Maryland could articulate a legitimate justification for HB 1056's impairment of AstraZeneca's PPA, that justification would not be reasonable and necessary to achieve the State's goals.

### *HB 1056 Violates the Federal and Maryland Takings Clauses*

90.     The Takings Clause of the U.S. Constitution provides that "private property" may not "be taken for public use, without just compensation." U.S. Const. amend. V.

91.     The Takings Clause of the Maryland Constitution provides that the government cannot enact any law "authorizing private property to be taken for public use without just compensation." Md. Const. art. III, § 40.

92.     Under these Takings Clauses, although the government may take private property "for public use" so long as it pays "just compensation," the government may never take private property for *private* use, regardless of the amount of compensation paid. As the U.S. Supreme

Court has explained, "the sovereign may not take the property of *A* for the sole purpose of transferring it to another private party *B*," a prohibition that applies regardless of whether "*A* is paid just compensation." *Kelo*, 545 U.S. at 477; *see Valsamaki*, 397 Md. at 273-74. Such takings for private use are always unlawful, since "[n]o amount of compensation can authorize such action." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 543 (2005).

93. HB 1056 takes the private property of manufacturers like AstraZeneca for private, not public, use. The law forces manufacturers to transfer their prescription drugs to other private (non-governmental) entities—namely, to contract pharmacies and the covered entities with which they contract.

94. This forced transfer would be unlawful even if manufacturers were paid just compensation for these contract pharmacy sales. *See id.* But manufacturers are *not* justly compensated for the forced transfers covered by the law: The law requires manufacturers to make these transfers at steeply discounted prices, well below fair market value.

95. This forced transfer results in the "physical appropriation" of manufacturers' prescription drugs by contract pharmacies and covered entities, and it therefore constitutes "a *per se* taking." *Cedar Point Nursery v. Hasid*, 594 U.S. 139, 149 (2021).

96. But even if HB 1056 did not involve a physical appropriation, it would still constitute a regulatory taking because it (1) has a profound economic impact on the value of the property subject to the law; (2) significantly interferes with manufacturers' investment-backed expectations; and (3) forces manufacturers to transfer title to their property, depriving them of the full use and enjoyment of that property. *See Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978).

97.     HB 1056 accordingly violates the Takings Clauses of the U.S. Constitution and the Maryland Constitution.

## CLAIMS FOR RELIEF

### *FIRST CLAIM FOR RELIEF*

**(Declaratory/Injunctive Relief – HB 1056 is Preempted by Section 340B
Supremacy Clause, U.S. Const. art. VI, cl. 2)**

98.     Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs.

99.     The Supremacy Clause, U.S. Const. art. VI, cl. 2, prohibits a State from enacting any law "which interferes with or is contrary to federal law." *King*, 594 F.3d at 309 (quoting *Felder*, 487 U.S. at 138). The mandates imposed on drug manufacturers by HB 1056, and its associated enforcement mechanisms, are preempted by the 340B statute under the Supremacy Clause.

100.    HB 1056 conflicts directly with Section 340B. The obligation imposed by HB 1056 on manufacturers—to deliver 340B-discounted drugs to unlimited contract pharmacies—directly conflicts with federal court rulings upholding AstraZeneca's contract pharmacy policy and enjoining HHS and HRSA from enforcing against AstraZeneca the same reading of the 340B statute that HB 1056 now mandates. Maryland may not compel manufacturers to comply with a statutory interpretation that federal courts have already declared unlawful.

101.    HB 1056 also creates an obstacle to the accomplishment and execution of Congress's objectives for the 340B statute. It imposes significant new costs for participating in a federal benefits program, thereby "exert[ing] an extraneous pull on the scheme established by Congress" and "skew[ing]" the "delicate balance of statutory objectives." *Buckman*, 531 U.S. at 348, 353. In addition, Section 340B includes a comprehensive regime for enforcement and

management of the program, which includes the ADR process, audits, and civil monetary penalties. HB 1056's attempt to insert into Congress's program a layer of enforcement by state officials under Maryland law frustrates Congress's purposes and interferes with the carefully specified federal regime it created.

102.     Finally, Congress created and occupied the entire field of regulation under Section 340B. The program is a comprehensive scheme that balances the federal interests, including assisting vulnerable populations and preserving program integrity. HB 1056 intrudes into this exclusive federal domain by effectively adding a new category of covered entity—contract pharmacies—to the exclusive statutory list. In constructing the 340B program, Congress left no room for supplementary state regulation.

103.     For these reasons, HB 1056's provisions requiring manufacturers to distribute 340B-discounted drugs to unlimited contract pharmacies, and empowering Defendants Brown and the Board of Pharmacy to pursue purported violations of the statute, are preempted by federal law under the Supremacy Clause.

### *SECOND CLAIM FOR RELIEF*

**(Declaratory/Injunctive Relief – HB 1056 is Preempted by Federal Patent Law
Supremacy Clause, U.S. Const. art. VI, cl. 2)**

104.     Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs.

105.     The Supremacy Clause, U.S. Const. art. VI, cl. 2, prohibits a State from enacting any law "which interferes with or is contrary to federal law." *Felder*, 487 U.S. at 138. And state laws that cap or fix drug prices are preempted by federal patent law because they "re-balance the statutory framework of rewards and incentives . . . in effect diminishing the reward to patentees in order to provide greater benefit to . . . drug consumers." *BIO*, 496 F.3d at 1374.

106.    HB 1056's provisions requiring manufacturers to distribute 340B-discounted drugs to unlimited contract pharmacies, and empowering Defendants Brown and the Board of Pharmacy to pursue purported violations of the statute, are preempted by federal patent law under the Supremacy Clause.

107.    The obligation imposed by HB 1056 on manufacturers—to deliver 340B-discounted drugs to unlimited contract pharmacies—restricts the prices at which manufacturers can sell their patented drugs and constrains manufacturers' "opportunity" to take advantage of the benefits of exclusivity "during the patent's term." *Id.* at 1372. The Act therefore impermissibly seeks to cap prices and to "re-balance" the "rewards and incentives" embodied in the federal patent laws. *Id.* at 1374. HB 1056 is therefore preempted by federal patent law under the Supremacy Clause.

### THIRD CLAIM FOR RELIEF

### (Declaratory/Injunctive Relief – HB 1056 Violates the Contracts Clause, U.S. Const. art. I, § 10, cl. 1)

108.    Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs.

109.    Under the Contracts Clause, U.S. Const. art. I, § 10, cl. 1, "[n]o State shall ... pass any … Law impairing the Obligation of Contracts." The Contracts Clause thus prohibits States from enacting legislation that "operate[s] as a substantial impairment of a contractual relationship." *Catawba Indian Tribe*, 501 F.3d at 371.

110.    HB 1056 violates the Contracts Clause. It substantially impairs AstraZeneca's PPA with the HHS Secretary by requiring delivery of 340B-discounted drugs to unlimited contract pharmacies, thus purporting to substantially expand AstraZeneca's obligations under the agreement beyond what the agreement itself provides.

111.    Maryland has no valid justification for impairing AstraZeneca's PPA. AstraZeneca's policy ensures that every covered entity is offered 340B drugs at statutorily required prices. The policy also allows covered entities without an on-site pharmacy to utilize a single contract pharmacy, which is more than the statute requires. Compelling AstraZeneca to provide 340B-discounted drugs to unlimited contract pharmacies would advance the economic interests of for-profit pharmacies at AstraZeneca's expense, with little to no cost benefit to 340B patients.

112.    Even if Maryland could identify a legitimate justification for impairing AstraZeneca's PPA, it would not be reasonable and necessary to achieve the State's goals.

113.    HB 1056 is unconstitutional under the Contracts Clause to the extent it requires AstraZeneca to deliver discounted drugs to contract pharmacies that do not qualify as covered entities, and which therefore are not included within the anticipated or actual scope of the PPA that AstraZeneca signed with the HHS Secretary.

### FOURTH CLAIM FOR RELIEF

**(Declaratory/Injunctive Relief – HB 1056 Violates the Takings Clauses of the U.S. Constitution, amend. V, and the Maryland Constitution, art. III, § 40)**

114.    Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs.

115.    Under the Takings Clause of the U.S. Constitution, amend. V, and the Takings Clause of the Maryland Constitution, art. III, § 40, the government may not take "private property" for private use—such as requiring the transfer of ownership from one private party to another—even if just compensation is paid.

116.    HB 1056 takes private property for private use by forcing manufacturers to transfer their prescription drugs to contract pharmacies and covered entities.

117.    HB 1056 also denies manufacturers just compensation because it requires that their drugs be transferred to contract pharmacies at below-market prices.

118.    The forced transfer of drugs under HB 1056 constitutes a taking per se or, in the alternative, a regulatory taking.

119.    HB 1056 is therefore unconstitutional under the federal and Maryland Takings Clauses.

## PRAYER FOR RELIEF

**NOW, THEREFORE,** AstraZeneca requests a judgment in its favor against Defendants as follows:

A.    Declare that HB 1056 is preempted by Section 340B and is therefore null, void, and unenforceable;

B.    Declare that HB 1056 is preempted by federal patent law and is therefore null, void, and unenforceable;

C.    Declare that HB 1056 is unconstitutional as applied to AstraZeneca under the Contracts Clause of the U.S. Constitution;

D.    Declare that HB 1056 is unconstitutional as applied to AstraZeneca under the Takings Clauses of the U.S. Constitution and the Maryland Constitution;

E.    Declare that AstraZeneca is not required to offer 340B discounts for unlimited contract pharmacy sales under Maryland law;

F.    Issue preliminary and permanent injunctive relief preventing Defendants from implementing or enforcing HB 1056 against AstraZeneca or any of its affiliates, officers, agents, or contractors;

G.    Issue preliminary and permanent injunctive relief preventing Defendants from seeking civil penalties, equitable relief, or any other remedy based on any alleged

violation of HB 1056 by AstraZeneca or any of its affiliates, officers, agents, or contractors;

H.      Award AstraZeneca reasonable attorneys' fees and costs, as appropriate; and

I.      Grant such other and further relief as the Court may deem appropriate.

Dated: June 27, 2024          Respectfully submitted,

                                /s/ Michael A. Pichini
                              Michael A. Pichini (Federal Bar #26342)
                              Jeffrey J. Hines (Federal Bar #03803)
                              GOODELL, DEVRIES, LEECH & DANN, LLP
                              One South Street, 20th Floor
                              Baltimore, MD 21202
                              Telephone: (410) 783-4000 | Fax: (410) 783-4040
                              jjh@gdldlaw.com
                              map@gdldlaw.com

                              Jeffrey L. Handwerker
                              Allon Kedem*
                              Stephen K. Wirth*
                              Samuel I. Ferenc
                              ARNOLD & PORTER KAYE SCHOLER LLP
                              601 Massachusetts Ave., NW
                              Washington, DC 20001-3743
                              Telephone : (202) 942-5000 | Fax: (202) 942-5999
                              allon.kedem@arnoldporter.com
                              jeffrey.handwerker@arnoldporter.com
                              stephen.wirth@arnoldporter.com
                              sam.ferenc@arnoldporter.com

                              *Applications to be admitted pro hac vice forthcoming*

                              *Attorneys for Plaintiff AstraZeneca Pharmaceuticals LP*